

FILED
CLERK, U.S. DISTRICT COURT

NOV 29 2004

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY



ENTERED
CLERK, U.S. DISTRICT COURT

DEC - 1 2004

CENTRAL DISTRICT OF CALIFORNIA
BY

Priority ✓
Send ✓
Enter ✓
Closed ___
JS-5/JS-6 ___
JS-2/JS-3 ___
Scan Only ___

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC A. BACKHAUS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>SUPERCONDUCTOR TECHNOLOGIES, INC.; M. PETER THOMAS; and MARTIN S. McDERMUT,<br><br>Defendants. | CASE NO. CV 04-2680 DT (JTLx)<br><br>ORDER **GRANTING IN PART** CLASS PLAINTIFFS' MOTION TO LIMIT THE SCOPE OF CONFIDENTIALITY AGREEMENTS SIGNED BY FORMER SUPERCONDUCTOR TECHNOLOGIES, INC. EMPLOYEES |

## I. Background

### A. Factual Summary

The following facts are alleged in the Class Action Complaint:

This is a federal class action brought by Marc A. Backhaus ("Plaintiff") on behalf of himself and all purchasers of the common stock of Superconductor Technologies, Inc. ("Plaintiffs") against Defendants Superconductor Technologies, Inc. ("STI" or the "Company") and individual defendants, M. Peter Thomas ("Thomas"), and Martin S. McDermut



("McDermut") (collectively "Individual Defendants") (all defendants herein referred to as "Defendants"), seeking monetary damages under the Securities Exchange Act of 1934 (the "Exchange Act"). Class Action Complaint, ¶ 1.

Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3). The class consists of individuals who purchased or otherwise acquired the securities of STI between January 9, 2004 and March 1, 2004, inclusive (the "Class Period"), and who were damaged thereby, excluding the Company, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Company has or had a controlling interest (the "Class"). Id. at ¶ 17.

STI describes itself as the global leader in developing, manufacturing, and marketing superconducting products for wireless networks. Id. at ¶ 23. STI's flagship product, SuperLink™ Rx, incorporates patented high-temperature superconductor technology to create a cryogenic receiver front-end used by wireless operators to enhance network performance, reduce costs, increase capacity utilization, lower dropped and blocked calls, extend coverage, and enable higher wireless transmission data rates. Id.

On January 9, 2004, STI announced that it had filed a Form S-3 shelf registration statement with the SEC. Id. at ¶ 24. In its press release announcing the filing of the S-3, Defendant Thomas stated, "STI has been growing rapidly. We want to make sure we have access to any financing we may need to fund continued growth." Id.

On February 4, 2004, STI issued a press release entitled "Superconductor Technologies Announces Preliminary Results for 2003" which announced preliminary unaudited financial results for the fourth quarter of 2003

($16.4 million in total net revenue), and for the year ($49.4 million in total net revenue). Id. at ¶ 25. STI also declared that it expected to announce that the fourth quarter of 2003 was profitable, the first profitable quarter the Company ever experienced. Id.

On March 1, 2004, STI issued a press release entitled "Superconductor Technologies, Inc. Announces Fourth Quarter and Year-End 2003 Results" in which the expected quarterly and year-end results announced in the February 4, 2004 press release were affirmed. Id. at ¶ 26. The press release also included the following First Quarter 2004 financial guidance: "STI expects first quarter 2004 total net revenues of $4 million. Thomas stated, 'We currently anticipate lower than previously forecasted revenues and a net loss in the first quarter of 2004.'" Id. As a result of the lower than expected revenues, the stock price for STI plummeted 45% from $4.09 to $2.26 per share in trading, more than seven times the daily average. Id. at ¶ 27.

The statements STI made in its press releases were materially false and misleading because they failed to disclose and misrepresented the following material adverse acts which were known to Defendants or recklessly disregarded by them: (1) that STI was not experiencing rapid growth because two of its important customers had either frozen capital spending or were focusing all corporate resources and efforts into projects which did not utilize STI products such that STI was experiencing a decreased demand for its products; (2) that STI had not created any new business or obtained new customers during this time; and (3) that STI knew that it could not realize revenues of $10-13 million for the first quarter of 2004. Id. at ¶ 29.

On March 11, 2004, STI filed its Form 10-K for the year ended December 31, 2003 with the SEC. Id. at ¶ 30. The Company stated that one of its

major customers was being acquired (AT&T Wireless) and another major company (Verizon Wireless) had decided to greatly accelerate its project to roll out third generation technology which delayed projects that utilized STI's products. Id. at ¶¶ 30, 31. Defendants knew, or should have known that AT&T Wireless' announcement with respect to becoming acquired and Verizon Wireless' announcement with respect to producing third generation technology, would negatively impact STI's revenues; yet Defendants represented to the investing public that STI would achieve revenues of $10-13 million for the first quarter of 2004, knowing that this figure was unattainable. Id. at ¶ 34.

### 1. Cause of Action for Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

STI and Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of STI's securities; and (iii) cause Plaintiff and other members of the Class to purchase STI's securities at artificially inflated prices. Id. at ¶ 41.

Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon purchasers of the Company's securities in an effort to maintain artificially high market prices for STI's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Id. at ¶ 42.

Defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and effect of concealing STI's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. Id. at ¶ 46.

By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder. Id. at ¶ 49. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period. Id. at ¶ 50.

### 2. Cause of Action for Violation of Section 20(a) of The Exchange Act

Individual Defendants acted as controlling persons of STI within the meaning of Section 20(a) of the Exchange Act. Id. at ¶ 52. By virtue of Individual Defendants high-level positions, their ownership and contractual rights, their participation in, knowledge and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which the Class contends are false and misleading. Id. at ¶ 52. Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Id. at ¶ 53.

5

Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. Id. at ¶ 54. By virtue of their positions as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. Id. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's preferred securities during the Class Period. Id. at ¶ 54.

Plaintiffs bring this action as a class action. The members of the Class are so numerous that joinder of all members is impracticable. Id. at ¶ 18. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Id. Common questions of law and fact exist at to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of STI;

(b) Whether the federal securities laws were violated by Defendants' acts as alleged herein and harmed the members of the Class; and

(c) To what extent the members of the Class have sustained damages and the proper measure of damages.

Id. at ¶ 21.

Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for STI publicly traded securities. Id. at ¶ 47. Plaintiffs and the Class would not have purchased

1 | STI public traded securities at the prices they paid, or at all, if they had been aware
2 | that the market prices had been artificially and falsely inflated by Defendants'
3 | misleading statements. Id. at ¶ 48.
4 |       Plaintiffs pray for judgment as follows: declaring this action to be a
5 | proper class action; awarding compensatory damages, including interest; awarding
6 | reasonable costs and expenses incurred in this action; and such other relief as the
7 | Court may deem proper. Id. at ¶16.

### B. Procedural Summary

On April 16, 2004, Plaintiffs filed the Class Action Complaint and Demand for Jury Trial.

On June 15, 2004, Plaintiffs Marc A. Backhaus and Jay Jakubowitz filed The Jakubowitz Group's Notice of Motion and Motion; Memorandum of Points and Authorities in Support of Motion to Consolidate the Related Actions; For Appointment of Lead Plaintiff; and For Approval of Its Choice of Counsel as Lead and Liaison Counsel For the Class.

On July 12, 2004, Defendants filed their Statement of Non-Opposition to Motion to Consolidate.

On August 2, 2004, this Court filed an Order granting The Jakubowitz Group's Motion to Consolidate the Related Actions; For Appointment of Lead Plaintiff; and For Approval of Its Choice of Counsel as Lead and Liaison Counsel For the Class.

On August 25, 2004, Plaintiffs filed a Stipulation and Order Extending Deadline for Filing Amended Complaint and Deadline for Filing of Responsive Pleading.

On October 4, 2004, Plaintiffs filed a First Amended Consolidated Class Action Complaint.

On October 13, 2004, Plaintiffs filed a Notice of Filing of Exhibit Inadvertently Omitted from First Amended Complaint.

On November 2, 2004, Plaintiffs filed a Motion to Limit the Scope of Confidentiality Agreements Signed by Former Superconductor Technologies, Inc. Employees, which is before this Court.

On November 18, 2004, Defendants filed a Motion to Dismiss First Amended Consolidated Class Action Complaint.

## II. DISCUSSION

### A. Standard

The Private Securities Litigation Reform Act of 1995 ("Reform Act") requires that plaintiffs alleging securities fraud "plead with particularity both falsity and scienter." Ronconi v. Larkin, 253 F. 3d 423, 429 (9th Cir. 2001). A securities fraud complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Furthermore, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

The Reform Act was passed in response to several perceived abuses in securities litigation, including discovery abuses. More specifically, the purpose of the Reform Act is "to restrict abuses in securities class-action litigation, including:

(1) The practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability;

  (2) The targeting of "deep pocket" defendants;

  (3) The abuse of the discovery process to coerce settlement; and

  (4) Manipulation of clients by class action attorneys."

SG Cowen Sec. Corp. v. U.S. Dist. Ct. for the N. Dist. of Cal., 189 F.3d 909, 911 (9th Cir. 1999) (quoting In re Advanta Corp. Sec. Litig., 180 F. 3d 525, 530-31 (3d Cir. 1999)). Under the Reform Act, "all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u-4(b)(3)(B). The Reform Act was not intended to provide defendants with immunity from suit, but, rather, was intended to protect defendants from the burdens of defending against frivolous litigation. See In re JDS Uniphase Corp. Sec. Litig., 238 F. Supp. 2d 1127, 1134 (N.D Cal. 2002).

**B. Analysis**

  Presently before this Court is Plaintiffs' Motion to Limit the Scope of Confidentiality Agreements Signed by Former Superconductor Technologies, Inc. Employees ("Motion"). Plaintiffs' Motion seeks a Court order (1) limiting the scope of the STI Confidentiality Agreements (the "Agreements") so that they will not prohibit former STI employees from responding to a certain set of questions posed by Plaintiffs and/or by Plaintiffs' Counsel relating to Defendants' alleged securities fraud, and (2) requiring STI to send a copy of the order to all former employees that signed an STI confidentiality agreement or received a copy of STI's letter.[1] Plaintiffs argue that STI is using the Agreements to impede

---

[1] Following the filing of this action, STI and its counsel mailed letters to its former employees notifying them that they may be contacted about this litigation. The letter stated in full:

Dear Former Employee:

As you may know, Superconductor Technologies Inc. ("STI" or the "Company") is currently a defendant in certain class action lawsuits alleging that STI violated the securities laws. In connection with these lawsuits, you may be contacted by various individuals seeking information about STI. These contacts may come from plaintiff's lawyers, private investigators (typically working for plaintiff's lawyers), customers, investors, vendors, reporters, or others.

We write to inform you that you have no obligation to talk to these individuals and to remind you that when you left STI you signed a Separation Agreement & Release in which you agreed to maintain the confidentiality of all confidential and proprietary information of the Company and to continue to comply with the terms and conditions of the Proprietary Information Agreement between yourself and STI.

We would appreciate it if you would please call Marty McDermut at STI before providing any information to anybody outside STI concerning the Company or the lawsuits. Mr. McDermut's phone number is (805) 690-4539.

If you wish, you can contact STI's counsel, Richard Zelichov at Irell & Manella, in connection with these lawsuits at no charge to you. Mr. Zelichov's phone number is (310) 277-1010.

Thank you very much.

Ken Barry

Plaintiffs' investigation of securities fraud. Furthermore, Plaintiffs argue that the Agreements are unduly broad and should be deemed void as against public policy.

### 1. The Reform Act's stay on discovery is not implicated because sending questionaires to Defendants' former employees with the explicit instruction that the employees are not obligated to fill-out the questionaire does not fall within the scope of discovery

The chief question before the Court is whether "discovery" includes Plaintiffs sending to Defendants' former employees a set of questions to be voluntarily answered by those employees. Defendants essentially argue that sending such a questionaire is discovery and therefore prohibited under the Reform Act.

According to Black's Law Dictionary, discovery is defined as *"compulsory* disclosure, at a party's request, of information that relates to the litigation." Black's Law Dictionary 498 (8th ed. 1999). The Court found no case law to dispute this definition of discovery. Now, applying the definition of discovery to the present matter, the Court notes that Plaintiffs are not compelling, through Court order or otherwise, that Defendants' former employees answer Plaintiffs' questions. As such, the Court does not find that Plaintiffs' questions to Defendants' former employees can be considered discovery by definition. As discussed below, case law supports this conclusion.

In <u>In re JDS Uniphase Corp. Sec. Litig.</u>, 238 F. Supp. 2d 1127, 1133 (N.D. Cal. 2002), the plaintiffs in a securities fraud class action suit against defendant JDSU moved for an order limiting the scope of confidentiality

---

Vice President, Human Resources
Plaintiffs' Motion, Exh. 2, p. 34.

11

agreements signed by former employees. Id. at 1127. The lead plaintiff in the case had been investigating acts of JDSU as well as individual defendants relating to alleged artificial inflation of the price of JDSU securities during a particular class period. Id. at 1130. Former employees of JDSU informed investigators that they were willing to talk about relevant activities at JDSU during the class period, but believed they were unable to do so because of one or more confidentiality agreements that they entered into with JDSU at the time they were either hired, terminated, or both. Id. at 1130. The court held that confidentiality agreements binding former employees did not preclude former employees from disclosing non-trade secret, non-privileged information regarding securities fraud. Id. at 1138. The court found that the questions set forth by plaintiffs did not violate JDSU's confidentiality agreements. Furthermore, the court "require[d] the parties to enter into a protective order providing that any information plaintiffs learn during the course of these interviews may be used only for purposes of this litigation." Id.

Plaintiffs accurately rely on In re JDS for the proposition that Plaintiffs are not using the court process to *require* former employees to provide information about STI's activities. Id. at 1133 (emphasis added). "[Plaintiff] does not seek discovery, but merely seeks a ruling on the scope of JDSU's confidentiality agreements with its former employees, so that it may speak with former employees who wish to voluntarily cooperate with [Plaintiff's] investigation." Id. at 1134. "Unlike discovery and initial disclosures, these interviews are not compelled by the Federal Rules of Civil Procedure." Id. "Neither the former employees nor the defendants are required to participate in these interviews." Id.

12

Defendants contend that even if the Court finds that Plaintiffs' questionaires to Defendants' former employees are not considered "discovery," Plaintiffs' present Motion is an "other proceeding" which is prohibited under the Reform Act. According to Defendants, Plaintiffs' Motion is an "other proceeding" because it is the functional equivalent of a motion to compel. This argument is nonsensical because, as stated above, Plaintiffs are not compelling STI's former employees to answer questions. Further, Defendants provide the Court with bare conclusions and offer no case law to buttress their contention that a Motion to Compel is tantamount to an "other proceeding" as contemplated under the Reform Act.

Defendants further surmise that if the stay on discovery did not apply in this case, Plaintiffs would likely subpoena STI's former employees for deposition, and if the former employees refused to answer any questions in reliance upon their confidentiality obligations, Plaintiffs would bring a motion to compel. Therefore, Defendants argue, this motion falls squarely within the purview of the Reform Act's stay. Again, because Plaintiffs' proposed set of questions to be voluntarily answered by Defendants' former employees is not discovery, Defendants' arguments are unavailing.

Defendants also maintain that Plaintiffs somehow lack standing to bring the current Motion because Plaintiffs have not submitted evidence sufficient to show that they are injured by STI's confidentiality agreements, or that any such injury will be redressed by the ruling Plaintiffs seek. However, Plaintiffs argue that when STI's letter to its former employees is read in conjunction with the Agreements, it becomes clear that former employees were told not to cooperate

13

with Plaintiffs' lawyers and/or investigators.[2] Plaintiffs know of at least one former employee that is willing to come forward with relevant and material information but for his Agreement with STI. Thus, Plaintiffs maintain that they have suffered a concrete injury as a result of the overly broad Agreements and letter to STI's former employees. The Agreements have significantly reduced the effectiveness of one of Plaintiffs' few tools, interviews with former employees, available to develop facts sufficient to meet the pleading requirements of the Reform Act.

### 2. Plaintiffs are not requesting information relating to trade secrets, and therefore, the Agreements do not bar the requested written communication between Plaintiffs and STI's former employees

Plaintiffs' Motion requests that the Court limit the Agreements signed by Defendants' former employees such as to permit Defendants' former employees to voluntarily answer a set of questions posed by Plaintiffs. Although the Court finds good reason to permit Plaintiffs to ask questions of Defendants' former employees by way of the questionnaire, the Court finds that because the questions posed do not violate the Agreements, the scope of the Agreements need not be limited at this time.

---

[2] The Agreement provides in part: "Employee agrees that he will not counsel or assist any attorneys or their clients in the presentation or prosecution of any disputes, differences, grievances, claims, charges, or complaints by any third party against the Company and or any officer, director, employee, agent, representative, shareholder or attorney of the Company, unless under a subpoena or other court order to do so." The Agreement further requires former employees to "keep the terms and conditions" of the Agreement confidential and "maintain in confidence the existence of this agreement" and "any allegations relating to the Company and or his/her employment with the Company . . . ." Plaintiffs' Motion, Exhibit 3, p. 35.

Plaintiffs acknowledge that STI, like all companies, has a legitimate business interest in protecting its trade secrets, and therefore, can ask its employees to sign confidentiality agreements requiring them not to disclose such secrets. California law defines a trade secret as "information, including formula, pattern, compilation, program, device, method, technique, or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Imax Corp. v. Cinema Techs., Inc., 152 F. 3d 1161, 1165 (1998) (citing Cal. Civ. Code § 3426.1(d)).[3]

According to Defendants, however, STI's Agreements contain broad provisions protecting information not relating in any way to trade secrets. Plaintiffs request that STI's former employees answer the following questions, which Plaintiffs maintain do not relate to trade secret information:

    a.    What was your position(s) and duration of employment with STI?

    b.    Are you aware that STI projected to the public that it would turn a profit by the Fourth Quarter 2003?

---

[3] Similarly, Black's Law Dictionary defines trade secret as "[a] formula, process, device, or other business information that is kept confidential to maintain an advantage over competitors; information - including a formula, pattern, compilation, program, device, method, technique, or process - that (1) derives independent economic value, actual or potential, from not being generally known or readily ascertainable by others who can obtain economic value from its disclosure or use, and (2) is the subject of reasonable efforts, under the circumstances, to maintain its secrecy." Black's Law Dictionary 1533 (8th ed. 1999).

15

    c.    Are you aware that in February 2004 STI published revenue guidance projecting First Quarter 2004 net revenues to be between $10 million and $13 million?

    d.    Did you hear about STI's miss of its first quarter 2004 revenue guidance and the decline in the Company's price stock and do you know what led to this miss?

    e.    Do you believe that STI's February 2004 revenue guidance for the First Quarter 2004 was realistically attainable?

    f.    Do you have any reason to believe that STI managers, officers or directors knew or had reason to believe that the February 2004 revenue guidance for the First Quarter 2004 was not realistically attainable?

    g.    At any time during 2003-2004 did you become aware of a significant downturn in STI's sales or revenue projections?

    h.    At any time during 2003-2004 did you become aware of lower customer orders and downturn in sales orders?

    i.    Do you have any reason to believe that STI managers, officers or directors became aware of a downturn in sales, orders or sales or revenue projections at any time during 2003-2004?

    j.    At anytime during 2003-2004 did you become aware of a significant decrease in purchasing (including cancellation or modification of contracts) by STI?

    k.    Do you have any reason to believe that STI managers, officers or directors became aware of a downturn in purchasing (or cancellation or modification of contracts) at any time during 2003-2004?

1.    l.    At any time during 2003-2004 did you become aware of a significant increase in STI's inventory?

m.    Do you have any reason to believe that STI managers, officers or directors became aware of that inventory increase at any time during 2003-2004?

n.    In 2003-2004 did you attend any meetings or receive any memorandums or emails in which sales, sales projections or revenue projections or expectations were discussed?

o.    Do you know how far into the future sales at the Company can be predicted with reasonable accuracy?

p.    STI attributed the revenue shortfall in First Quarter 2004 to issues with AT&T and Verizon. Do you believe that this was the real reason for the shortfall?

q.    When do you believe STI's management, officers and or directors realized that the issues with AT&T and Verizon would cut into sales?

r.    Who were the STI sales employees that were dealing with Verizon and/or AT&T during 2003-2004?

s.    Which sales employees were dealing with ALLTEL during 2003-2004?

t.    How were the Company's sales to AT&T, Verizon and ALLTEL in 2003-2004?

u.    How were the Company's sales to other customers during 2003-2004?

v.    Do you know if STI was expecting significant sales to AT&T, Verizon and ALLTEL in the First Quarter of 2004?

17

| | | |
|---|---|---|
| | w. | At any time during 2003-2004 was commercial revenue backlog decreasing? |
| | x. | Was there pressure from STI's managers, officers or directors to pull revenue into quarters in 2003? |
| | y. | Are you aware of any discussions about hitting/missing fourth quarter 2003 or first quarter 2004 numbers? |
| | z. | Are you aware that STI's commercial revenue backlog at December 31, 2003 was $250,000? |
| | aa. | Do you believe STI's management, officers or directors could reasonably have expected to realize $10-13 million in revenues in the First Quarter 2004 with a $250,000 backlog entering the quarter? |

Plaintiffs' Motion, pp. 21-25.

Upon review and careful consideration of the above questions, the Court concludes that the questions do not seek information about STI's trade secrets. Rather, the questions are aimed at obtaining information that is central to Defendants' alleged misconduct and to learn additional information about matters alleged in Plaintiffs' Amended Complaint. To prevent Plaintiffs from asking the above questions would be to impermissibly allow Defendants to "use [their] confidentiality agreements to chill former employees from voluntarily participating in legitimate investigations into alleged [financial] wrongdoing by [defendants]." In re JDS, 238 F. Supp. 2d at 1138.

Defendants argue that the questions call for answers that will likely reveal STI's protected trade secrets. For example, Defendants argue that Plaintiffs' questions concerning STI's projections will likely require responses that reveal STI's marketing strategies to increase demand and sales to its customers including potentially STI's promotional programs, advertising, and strategic plans.

However, upon review of Plaintiffs' questions as stated above, it does not appear to this Court that any questions will likely illicit the type of response that Defendants suggest. The Court is not persuaded that Plaintiffs' questions will lead to the disclosure of trade secret information, i.e., information "the public or . . . other persons . . . can obtain economic value from its disclosure or use." Cal. Civil Code § 3426.1(d).

However, the Court is concerned about the form of the questions asked by Plaintiffs in the questionnaire. By way of example, where a question calls for a "yes" or "no" answer, a problem exists. Where a respondent answers a question "yes," the Court suggests the following: "If your answer was "yes," what facts do you base your answer on?" By including this follow-up question a reviewer will be able to determine whether the answer has a substantive value for future discovery.

Another concern of this Court deals with the sharing of the information between the parties and the security of the answers. The Court is of the opinion that the information obtained from the responses should be sent to and placed in the care, custody and control of a neutral "special master" that will provide "eyes only" review to the attorneys for the parties. By utilizing the services of a "special master" the initial dissemination of the information will be limited and irrelevant, and hearsay material will not be circulated. In the event either party feels that the investigative information should be the subject of future formal discovery or deposition, the party or parties will seek the approval of the "special master" to develop or expand upon the information by way of written application.

///

///

19

## III. CONCLUSION

Accordingly, this Court **grants in part** Plaintiffs' Motion to Limit the Scope of Confidentiality Agreements Signed By Former Superconductor Technologies, Inc. employees. In doing so, the Court only permits Plaintiffs to send Defendants' former employees the above enumerated questions a through aa as modified and expanded by the Court herein. Furthermore, although it is highly unlikely that information gleaned from the questions will encompass trade secret information, in an abundance of caution, the parties are hereby ordered to enter into a further protective order providing that any information Plaintiffs learn from questions a though aa may be used only for purposes of this litigation. The parties are to prepare and file the [Proposed] Protective Order no later than December 14, 2004.

IT IS SO ORDERED.

DATED: 11/29/04

**DICKRAN TEVRIZIAN**
Dickran Tevrizian, Judge
United States District Court

20